**JUDGE HOLWELL**

**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866
Fax:    (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

**'08 CIV 6435**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

TRANSASIA POOL PTE LTD.

                  Plaintiff,

          - against -

NAMJEON INTERNATIONAL CO. LTD AND
NJ SHIPPING CO. LTD.

                Defendants.

-----------------------------------------------------------X

ECF CASE

08 CIV \_\_\_ (\_\_)

**VERIFIED COMPLAINT**

    Plaintiff, TRANSASIA POOL PTE LTD. (hereinafter referred to as "Plaintiff"), by its

attorneys, LAW OFFICES OF RAHUL WANCHOO, alleges on information and belief as

follows:

### JURISDICTION AND VENUE

    1.    This is a case of admiralty and maritime jurisdiction within the meaning of Rule

9(h) of the Federal Rules of Civil Procedure, and within the admiralty and maritime jurisdiction

of the United States and of this Honorable Court. This case also falls under the Court's

admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Finally, this Court also has

jurisdiction over this matter because the action also arises under the convention on the
Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et. seq.*
and/or the Federal Arbitration Act, 9 U.S.C. §1 *et. seq.*

## THE PARTIES

1.    At all material times, Plaintiff, Transasia Pool Pte. Ltd. was and now is a foreign
corporation organized and existing under and by virtue of the laws of the Republic of
Singapore, and was the Charterer of the M.V. EASTERN SUN (the "Vessel"), a motor vessel of
about 22,201 deadweight tons capacity engaged in the carriage of bulk cargo by water.

2.    Upon information and belief, at all material times, Namjeon International Co.
Ltd. ("Defendant" or "Namjeon"), was and now is a foreign corporation organized and existing
under and by virtue of the laws of the Republic of Korea, and was the disponent Owner of the
Vessel.

3.    Upon information and belief, at all material times, NJ Shipping Co. Ltd. ("NJ
Shipping"), was and now is a foreign corporation organized and existing under and by virtue of
the laws of a foreign country and was, and still is, at all material times the alter-ego, alias and/or
paying agent or beneficiary of Namjeon.

## FACTS GIVING RIGHTS TO CLAIM

4.    On or about February 25, 2008, a time charter party (the "Charter") was made
between Plaintiff, as Charterer of the Vessel, and Defendant as disponent Owner whereby
Plaintiff chartered the Vessel for the carriage of bulk cargo for a period up to minimum June 8,
2008 up to maximum July 8, 2008 in Charterer's option. The Vessel was delivered to Plaintiff at
0001 hours local time on February 27, 2008 at dropping last outward sea pilot Singapore. A
copy of the Charter dated February 25, 2008 is annexed as Exhibit 1 to the Verified Complaint.

2

6.    The Charter provided that Plaintiff shall pay for the use and hire of the Vessel at the rate of $26,250 per day pro rata payable every 15 days in advance. The Charter provided that hire was to be paid to NJ Shipping's bank account in Seoul, Korea as "beneficiary." The Charter also provided that "On Delivery all cargo holds to be completely clean/swept/washed down by fresh water and dried up and fully ready to receive any permissible cargo allowed under this charter in all respects free of salt, rust scale and previous cargo residue and should pass shipper or competent authorities inspection. Otherwise vessel to be put off-hire from the time of failing until the time of passing re-inspection and any time lost/expenses incurred thereby to be for Owners account."

7.    The Vessel arrived at Tarjun, Indonesia at 0430 hours on March 1, 2008. On arrival, an independent surveyor boarded the Vessel for inspection. After inspecting the Vessel's holds the surveyor found that the Vessel was not suitable to load grain and/or alumina cargoes and any permissible cargo due to the existence of loose rust, loose scale and loose paint/peeling in all the holds. In addition, rust stain could be seen in bulkheads, hoppers and tank-top. Accordingly, the surveyor failed the Vessel's hold cleanliness inspection, but concluded that the holds were suitable for the current cargo of cement clinker.

8.    On the basis of the survey report and pursuant to the terms of the Charter, Plaintiff placed the Vessel off hire effective March 1, 2008 at 1330 hours until such time the holds' condition had been upgraded and the Vessel had passed the hold cleanliness re-inspection. However, Defendant denied that the Vessel was off hire claiming that the holds were suitable to load the cement clinker, but ignoring the fact that Defendant had breached the Charter by delivering the Vessel with holds that were NOT "free of salt, rust scale and previous cargo residue" and ready to receive any "permissible cargo" allowed under the Charter.

3

9.    On March 6, 2008 Plaintiff advised the Defendant that either it should get the holds upgraded to meet the Charter requirements or accept full responsibility for all losses and damages that would arise should the Vessel's holds fail inspection during the period of the Charter. Plaintiff also advised Defendant that if it accepted the latter condition, Plaintiff would put the Vessel back on hire. However, Defendant ignored Plaintiff's request and instead claimed that the Vessel was ready to load clinker and refused to carry out any hold cleaning. A second attempt by Plaintiff by an independent surveyor to inspect the Vessel was turned down by the master on March 10, 2008 and the master refused to open hatches.

10.    Subsequent discussion between the parties failed to resolve the dispute. On March 13, 2008 following Defendant's threat to withdraw the Vessel from the service of the Plaintiff, Plaintiff agreed to load the cargo of clinker without prejudice to its rights and remedies under the Charter. On March 17, 2008 Plaintiff paid the second hire installment to Defendant from which it deducted off hire for time lost due to the failed hold inspection at Tarjun. On receipt of the Charter hire, Defendant threatened to withdraw the Vessel from Plaintiff's service unless Plaintiff remitted the off hire deduction in the amount of $433,022.86 to Defendant by April 4, 2008. On April 2 Defendant also instructed the master not to berth the Vessel at Yangon to load Plaintiff's cargo. In the circumstances, Plaintiff paid Defendant under protest the off hire deduction for the failed hold inspection at Tarjun so that Defendant would instruct the master to berth the Vessel at Yangon. Plaintiff now seeks reimbursement of the hire it paid Defendant under duress on April 4 as under the terms of the Charter Plaintiff is clearly exempt from paying hire for the period of the failed hold inspection.

11.    On or about March 27, 2008 Plaintiff entered into a back-to-back charter with Allied Maritime ("Allied") to carry a cargo of rice from Yangon to Dakar, West Africa. On or

4

about June 5, 2008, Defendant requested Plaintiff to redeliver the Vessel at Singapore-Japan range latest by July 8, 2008. On or about June 12, 2008 Plaintiff requested Defendant for an extension of time for redelivery as it was not possible to effect redelivery by July 8 given that the voyage from West Africa to Singapore would take about 29 days and the Vessel would only complete discharge and be free of her rice cargo on or about June 15. However, Defendant refused to extend the time for redelivery of the Vessel and on or about June 18, 2008 Defendant wrongfully terminated the Charter.

12.    As a reason of Defendant's early termination of the Charter, Plaintiff seeks reimbursement of the hire it paid to the Defendant in advance which was not earned as well as the value of the bunkers on board at the time of the forced early redelivery of the Vessel. A copy of Plaintiff's Provisional Hire Statement dated June 25, 2008 is annexed as Exhibit 2 to the Verified Complaint.

13.    By reasons of the premises, Plaintiff has sustained damages in the amount of $985,849.78 no part of which has been paid by the Defendant.

14.    The Charter also provided in that, if any dispute arises between the parties, the matter in dispute shall be referred to arbitration in Hong Kong with English law. In addition to the above, Plaintiff is also entitled, in Hong Kong, to attorneys' fees and other taxable costs incurred or likely to be incurred in bringing this claim, which as best as can presently be calculated are $250,000. (*See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 265 (2d Cir. 2002), where the attachment that the Court of Appeals reinstated covered "an amount that includes interest and anticipated attorneys' and arbitrators' fees.").

15.    Arbitration of these disputes in Hong Kong arbitration may take 2 years. Plaintiff is entitled to and would receive interest at the present rate of 7.5% compounded

5

monthly on the principal claim from June 18, 2008 to the completion of the arbitration or about
$157,954.50.

16.    Plaintiff's total claim against Defendants for which it seeks security herein is
$1,393,804.28 ($985,849.78 + $250,000 + $157,954.50).

17.    Upon information and belief, Namjeon uses NJ Shipping as "paying beneficiary"
or "pass through" entity such that it can insulate itself from creditors relating to its contracts.

18.    It is not general practice in the maritime community, nor anywhere else, for
independent companies to make large payments on behalf of other independent companies.

19.    Payments sent or received on behalf of another independent company are
suggestive of a relationship that is not "arms length".

20.    Upon information and belief, NJ Shipping is not only the holding parent of
Namjeon but is also the alter-ego of Namjeon because it dominates and disregards Namjeon's
corporate form to the extent that NJ Shipping is carrying on Namjeon's business and operations
as if the same were its own, or vice versa.

21.    Upon information and belief, Namjeon has no separate identity from NJ
Shipping.

22.    In the further alternative, Namjeon and NJ Shipping are partners and/or joint
ventures and are resident at one and the same address in Seoul.

23.    All and singular the premises are true and within the admiralty and maritime
jurisdiction of this Honorable Court.

24.    Plaintiff brings this action by seeking an order of seizure of Defendants' goods
and chattels, or credits and effects in the hands of garnishees to be named in the process, in the
amount sued for herein, so that the Court shall have jurisdiction to direct Defendants to proceed

with arbitration of Plaintiff's claim against Defendants and to retain jurisdiction to enter a judgment upon the arbitration award in the Hong Kong arbitration.

**WHEREFORE,** the Plaintiff prays the following:

1.      That process in due form of law according to the practice of this Court in causes of admiralty and maritime jurisdiction may issue against Defendants, Namjeon International Pte. Ltd. and NJ Shipping Co. Ltd. that they be personally cited to appear and answer the matters set forth above;

2.      That if the Defendants cannot be found within this District, then that Defendants' goods and chattels, or credits and effects within the hands of garnishees within the jurisdiction of this Court be attached by process pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims and in an amount sufficient to answer Plaintiff's claims of $1,393,804.28, the sum sued for in this Complaint;

3.      That the action thereafter be stayed pending the arbitration award and that a judgment be entered upon the award of the aforesaid arbitration for the amount of any recovery by Plaintiff, together with interest, costs and disbursements of this action; and

4.      That this Court grants to Plaintiff such other and further relief as may be just and proper in the circumstances.

Dated: New York, New York
       July 17, 2008

                              **LAW OFFICES OF RAHUL WANCHOO**
                              Attorneys for Plaintiff
                              Transasia Pool Pte Ltd.


                              By: _____
                                   Rahul Wanchoo (RW-8725)

## VERIFICATION

STATE OF NEW JERSEY)

                             ss.

COUNTY OF BERGEN  )

I, Rahul Wanchoo, being duly sworn, deposes and says:

I am an attorney at law and a member of the firm of Law Offices of Rahul Wanchoo, attorneys for Plaintiff.

I have read the foregoing Verified Complaint and know the contents thereof and the same are true to the best of my knowledge, information and belief.

The reason that this verification is made by me and not by Plaintiff is that Plaintiff is a foreign corporation and is not within this District.

_Rahul Wanchoo_

Sworn to and subscribed to
before me this 17th July, 2008

_Masha Elelman_
Notary Public

**Masha Elelman**
**Notary Public**
**State of New Jersey**
**My Comm. Expires Nov. 15, 2011**

# EXHIBIT 1

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)


# TIME CHARTER

New York Produce Exchange Form

*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1961; September 14th 1993.


| | |
|---|---|
| **THIS CHARTER PARTY,** made and concluded in ...Singapore................................ ...... ................................ | 1 |
| this 25th  day of **February, 2008**.............. ........... | 2 |
| Between **Namjeon International Co., Ltd, Rm No. 602, 6th Floor, Beomhwa Bldg, 70-1, Bukchang-Dong, Chung-Ku,** | 3 |
| **Seoul, Korea as Disponent Owners** | |
| ................................ ................................ ................................ ................................ | 4 |
| As Owners of the Vessel described below, and **Transasia Pool Pte Ltd,, 5 Temasek Boulevard Unit 12-01 Suntec Tower** | 5 |
| **five, Singapore 038985** | |
| ................................ ................................ ................................ ................................ | 6 |
| ................................ ................................ ................................ ................................ | 7 |
| As Charterers. | 8 |
| <u>Description of Vessel</u> | 9 |
| Name **Eastern Sun**................... Flag...**Vietnam** .............................. Built...1993.................(year) | 10 |
| ~~Port and number of Registry~~ ................................ ................................ ................................ | 11 |
| ~~Classed~~ ................................ ................................ in ................................ ................................ | 12 |
| ~~Deadweight~~ ................................ ................long*/metric* tons (cargo and bunkers, including freshwater and~~ | 13 |
| ~~stores not exceeding~~ ................................long*/metric* tons) on a saltwater draft of~~ | 14 |
| ~~on summer freeboard.~~ | 15 |
| ~~Capacity~~ ................................ cubic feet grain ................................ cubic feet bale space~~ | 16 |
| ~~Tonnage~~ ................................ ................................ GT/GRT.~~ | 17 |
| ~~Speed about ........... knots, fully laden, in good weather conditions up to and including maximum~~ | 18 |
| ~~Force on the Beaufort wind scale, on a consumption of about~~ ................................ long*/metric*~~ | 19 |

~~tons of~~................................................................................................................................................    20

\* *Delete as appropriate.*    21

*For further description see Appendix "A"(~~if applicable~~)*    22

**1. Duration**    23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period    24

of **minimum 8th June 2008 / maximum 8th July 2008 in Charterer's option via safe ports(s) safe berth(s) safe**    25
**anchorge(s) always afloat always accessible always within Institute Warranty Limits**

................................ ................................ ................................    26
................................ ................................ ................................ ................................ ................................    27
................................ ................................within below mentioned trading limits.    28

**2. Delivery**    29

The Vessel shall be placed at the disposal of the Charterers ~~at on~~ **dropping last outward sea pilot or passing one safe port**    30
**Singapore at any time day or night, Sundays holidays included**

    31
................................ ................................ ................................ ................................    32
................................ ................................ ................................ ................................ The vessel on her delivery    33
shall be ready **(See clause 71)** with all holds and tight, staunch, strong and in every way fitted    34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear    35
simultaneously.    36
~~The Owners shall give the Charterers not less than   days notice of expected  of delivery and   days notice of definite date of~~    37
~~delivery.~~ **The Oweners should inform the vessel's movement closely before 3/2/1 days notice of definite date of delivery.**    38

**3. On-Off Hire Survey**    39

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each~~ **jointly appoint an independent** ~~surveyors, for their~~    40
~~respective accounts, who at the delivery/redelivery respectively shall  not later than at first loading port/last discharging port~~    41
~~respectively, conduct~~
~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~    42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each the  surveyor, without~~    43
~~Prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~    44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~    45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~    46
~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~    47
**(see clause 46)**

**4. Dangerous Cargo/Cargo Exclusions**    48

~~(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,~~    49



2

~~Injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~     50
~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~     51
~~Shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~     52
~~Pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~     53
~~Excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~     54
..................... ..................................... ...................................... ...................................... ............................ ...............................  ..     55
............................. ...................................( see clause 47, 70) .. ............................. .............................. ...............................     56
..................... ...................................... ..................................... ...................................... ..................................... .........................     57
..................... ............................. .................................. ...................................... .......................................... ...............................     58
..................... ...................................... ..................................... ...................................... .......................................... ...............................     59
..................... ...................................... ..................................... ...................................... .......................................... ...............................     60
..................... ..................................... ...................................... ...................................... .......................................... ...............................     61
..................... ...................................... ..................................... ...................................... .......................................... ...............................     62
..................... ...................................... ..................................... ...................................... .......................................... ...............................     63
..................... ...................................... ..................................... ...................................... .......................................... ...............................     64
~~(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~     65
~~Tons and the Charterers shall provide the Master with any evidence he may~~     66
~~reasonably require to show that the cargo is packaged, labeled, loaded and stowed in accordance with IMO~~     67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~     68
~~the Charterers' risk and expense~~     **(See clause 47, 70)**     69

**5. Trading Limits**     70

The Vessel shall be employed in such lawful trades between safe ports and safe anchorages, safe berths     71

**AAAA within Institute Waranty Limits**     72

Excluding war and warlike zone, UN embargo area, Albania, Angola including Cabina, Etiopia, Eritrea, Filand, Georgia  Sea     73

including Abkhazia, Haiti, Israel, Libya including Gulf of Sidra/Sirte, Liberia, Nigeria, Nicaragua, Orinoco river, Sierra Leone,     74

of Azov, Zaire, also excluded countries or places where war  or warlike situation exist.     75

~~as the Charterers shall direct.~~     76

**6. Owners to Provide**     77

The Owners shall provide and pay for the insurance of the Vessel, ~~except as otherwise provided,~~ and for     78

all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; **fresh water, lubricating oil  &**     79
shall pay for

wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the     80

Crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and     81

equipment with all inspection certificates necessary to comply with all current requirement at all ports of call for and during the     82
service, and have a full complement of officers and crew.

**7. Charterers to Provide**     83



3

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise                    84

agreed; shall pay for port charges (including ~~compulsory watchmen and cargo watchmen and compulsory garbage disposal~~                    85

if any – **see clause 55**), ~~all communication expenses pertaining to the Charterers' business at cost all~~ (see cl. 52), **all** pilotages,                    86

towages, agencies, commissions for clearance and cargo purposes, boatage on Charterers business, consular charges (except                    87
those pertaining to individual crew members

or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel                    88

puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all                    89

such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew                    90

shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while                    91

the vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~                    92

~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~                    93

~~months or more.~~                    94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a                    95

special trade or unusual cargo, but the Owners shall allow them the use of any dunnage, lashing materials, other fittings/                    96
equipment already aboard the Vessel.

Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in their time.                    97

(See also Clause 52)                    98

**8. Performance of Voyages**                    99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance                    100

with the Vessel's crew. The Master shall be conversant with the English **and Vietnamese** language and                    101

(although appointed by the Owners) shall be under the orders and directions of the Charterers as regards                    102

employment and agency; and the Charterers shall perform all cargo handling, including but not limited to                    103

loading, stowing, trimming, lashing, securing, dunnaging, unlashing, re-lashing, discharging, and tallying, at their ~~risk~~                    104

~~And~~ expense, under the supervision of the Master.                    105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or                    106

officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary,                    107

make a change in the appointments.                    108

**9. Bunkers**                    109

~~(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and~~                    110

~~diesel oil remaining on board the Vessel as hereunder. The Vessel ............................... shall be delivered with~~                    111

~~long²/metric² tons of fuel oil at the price of per ton;~~                    112

~~tons of diesel oil at the price of per ton. The vessel~~                    113

~~be redelivered with tons of fuel oil at the price of per ton;~~                    114

~~tons of diesel oil at the price of per ton.~~                    115

~~Same tons apply throughout this clause.~~                    116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and                    117



4

auxiliaries and which conform to the  standard specification(s)  RME 25 ( for fuel oil) & DMB (for diesel oil ). **Charterers to arrange DMC when DMB not available but DMA in Singapore always.** ... 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines ... 119

or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed ... 120

specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed ... 121

specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners ... 122

shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker ... 123

consumption, nor for any time lost and any other consequences. ... 124

<u>10. Rate of Hire/Redelivery Areas and Notices</u> ... 125

The Charterers shall pay for the use and hire of the said Vessel  at the rate of  **USD 26,250**          per day pro rata including overtitme ... 126

................................................U.S. currency, or $ U.S. currency per ton on the Vessel's total deadweight ... 127

carrying capacity, including bunkers and stores, on summer freeboard, per 15 days  in advance, ... 128

commencing on and from the time of her delivery, as aforesaid, and at and after the same rate for any part ... 129

of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition, ... 130

ordinary wear and tear excepted, to the Owners (unless Vessel lost) at-  **on dropping last outward sea pilot** ... 131

**one safe port of  Singapore/Japan range  in charterers' option at any time** ... 132

**day or night, Sunday and holidays included.** ... 133

.................................. ..................................unless otherwise mutually agreed. ... 134

The Charterers shall give the Owners not less than  **30 days approximate and 20/10/7/5/4/3/2/1 definite** days notice of the ... 135

Vessel's date and port of redelivery . ... 136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be ... 137

adjusted to G.M.T. ... 138

<u>11. Hire Payment</u> ... 139

(a) Payment ... 140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in ... 141

................................,viz  **See clause 91** ,. ................................. ................................. ................................. ... 142

................................. ................................. ................................. ................................. ................................. ................................. ... 143

................................. ................................. ................................. ................................. ................................. ................................. ... 144

................................. ................................. ................................. ................................. ................................. ..........................in ... 145

................................. ..................................currency, or in United States Currency, in funds available to the ... 146

Owners on the due date, 15 days in advance, and for the last month or part of same the approximate ... 147

amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day ... 148

as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire, ... 149

or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to ... 150

withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) ... 151



| | |
|---|---|
| may otherwise have on the Charterers | 152 |
| at any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the | 153 |
| hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold | 154 |
| the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever | 155 |
| for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire | 156 |
| shall continue to accrue and any extra expenses resulting from such withholding shall be for the | 157 |
| Charterers' account. | 158 |

(b) Grace Period    159

| | |
|---|---|
| Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors | 160 |
| or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners | 161 |
| **two clear banking days** (as recognized at the agreed place of payment) written notice to rectify the | 162 |
| failure, and when so rectified within those two days following the Owners' notice, the payment shall | 163 |
| stand as regular and punctual. | 164 |
| Failure by the Charterers to pay the hire within **two days** of their receiving the Owners' notice as | 165 |
| provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11(a) above. | 166 |

(c) Last Hire Payment    167

| | |
|---|---|
| Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate | 168 |
| payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and | 169 |
| the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking | 170 |
| into account bunkers **estimated to be on board upon redelivery** ~~actually on board~~, to be taken over by the Owners and estimated disbursements for | 171 |
| the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the | 172 |
| balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be | 173 |
| refunded by the Owners or paid by the Charterers, as the case may be. Charterers have right to adjust the value of the redelivery bunkers and any other owners expenses from the last sufficient hire payment. | 174 |

(d) Cash Advances    175

| | |
|---|---|
| Cash to the master or cash for vessel's ordinary disbursements at any port may be advanced by the Charterers, as required by | 176 |
| The Owners, subject to 2.5% commission and such advances shall be deducted from the hire. | 177 |
| ~~The Charterers, however, shall in no way be responsible for the application of such advances.~~ | 178 |

**12. Berths**    179

| | |
|---|---|
| The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe anchorage that | 180 |
| Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat | 181 |
| at any time of tide. | 182 |

**13. Spaces Available**    183

| | |
|---|---|
| (a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can | 184 |
| reasonably and safety stow and carry), also accommodations for supercargo, if carried, shall be at the | 185 |



Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle, — 186

apparel, furniture, provisions, stores and fuel. — 187

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the — 188

Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a — 189

result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded. — 190

**14. Supercargo and Meals** — 191

The Charterers are entitled to appoint a supercargo if the vessels' lifeboat permited, who shall accompany the Vessel at the — 192

Charterers  risk and see that voyages are performed with due despatch. He is to be furnished with free **and suitable** — 193

accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of — 194

**USD 15.00** per day. The Owners shall victual pilots and customs officers, and also, when — 195

authorized by the Charterers or their agents in writing, shall victual tally clerks, stevedore's foreman, etc., — 196

Charterers paying at the rate of      per meal for all such victualling. — 197

**15. Sailing Orders and Logs** — 198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing — 199

directions, in writing, in the English and the Master shall keep full and correct deck and engine — 200

logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the — 201

Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, — 202

showing the course of the Vessel, **speed**, distance run, **direction of wind and sea** and the consumption of bunkers. Any log — 203

extracts  Required by the Charterers shall be in the English language. — 204

**16. Delivery/Cancelling** — 205

If required by the Charterers, time shall not commence before  **0001hours LT, 27th February, 2008** and should the — 206

Vessel not be ready for delivery on or before **2359hours LT, 1st March, 2008** but not later than hours, — 207

The Charterers shall have the option of cancelling this Charter Party. — 208

*Extension of Cancelling* — 209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready — 210

For delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty — 211

The date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is — 212

Expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will — 213

cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two — 214

days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date — 215

of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the — 216

Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers — 217

in accordance with this Clause. — 218

**17. Off Hire** — 219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency — 220



of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 221

arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222

agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223

Resulting from inherent vice, quality or defect of the cargo, **repair due to fault/deficiencies of vessel or her equipment,** 224
drydocking for the purpose of examination or

Painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225

hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226

during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227

to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228

of her deviating or putting back until she is again in the same or equidistant position from the destination 229

and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' 230

Account. In the event of the Vessel being driven into port or to anchorage through stress of weather, 231

trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses 232

Resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be 233

Reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and 234

the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses should be 235
deducted from the hire.

**In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or**
**Owners' store, break-down of machinery, damage to hull or other accident, either hindering or preventing the working** 236
**of the Vessel, no hire to be paid in respect of any time lost thereby during the period in which the Vessel is unable to**
**perform the service immediately required. Any hire paid in advance to be adjusted accordingly.**

**18. Sublet**                                                                                                            237

Charterers shall have liberty to sublet the Vessel ~~to Japanese or always to~~   to Charterers for all or any part of **the Time**
**Charter** covered by this Charter Party against former Charterers' Letter of Indemnity as in Owners' P. and I. wordings but 238
former Charterers remain responsible between for the fulfilment of this Charter party. Acceptance of delivery of the vessel
shall not constitute any waiver of Charterers' right under this Charter party.

_____ 239

_____ 240

**19. Drydocking**                                                                                                        241

The Vessel was last drydocked ................27th April, 2006 and 22nd June 2007                                242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter party~~         243

~~at a convenient time and place, but Owners shall give notice to Charterers not less than 45 days before, to be mutually agreed~~ 244
~~upon between the Owners and the Charterers, for~~

~~Bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~                         245

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter                      246

Party.                                                                                                                    247



8

*\* delete as appropriate*                                                                              248

**20. Total Loss**                                                                                        249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or                250

being last heard of) shall be returned to the Charterers at once.                                          251

**21. Exceptions**                                                                                        252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the       253

seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always         254

mutually excepted.                                                                                        255

**22. Liberties**                                                                                         256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels          257

in distress, and to deviate for the purpose of saving life and property. **However, in case of saving refugees the time and**     258

**expenses shall be for Owners' account/benefit**

**23. Liens**                                                                                             259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due             260

Under this Charter Party, including general average contributions, and the Charterers shall have a lien on          261

the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be            262

returned at once.                                                                                         263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,          264

which might have priority over the title and interest of the Owners in the Vessel. The Charterers                   265

undertake that during the period of this Charter Party, they will not procure any supplies or necessaries          266

or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

**In no event shall Charterers procure, or permit to be procured for the vessel, any supplies necessaries or services**          267

**without previously obtaining a statement signed by an authorized representative of the furnished thereof,**

**acknowledging that such supplies, necessaries or service are being furnished on the credit of Charterers and not on**

**credit of the vessel or her Owners, and that the furnisher claims no maritime lien on the vessel therefore.**

**24. Salvage**                                                                                           268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting               269

Owners' and Charterers' expenses and crew's proportion.                                                   270

**25. General Average**                                                                                   271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 2004, or any                 272

subsequent modification thereof, in **Singapore** and settled in **U.S.Dollars**                             273

currency.                                                                                                 274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will            275

Contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules            276

~~1974, as amended 1990,~~ **2004** or any subsequent modification thereof and will include the "New Jason            277



Clause" as per Clause 31.                                                                                    278

Time charter hire shall not contribute to general average. In case of GA, Owners to collect average bonds from Bills of lading    279

holders in which case Charterers always make best cooperation of their collection. The Charterers to provide an average bond    279

of their bunkers on board.

### 26. Navigation                                                                                           280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners        281

shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,    282

and all other matters, same as when trading for their own account.                                           283

### 27. Cargo Claims                                                                                         284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club     285

New York Produce Exchange Agreement **1996** ~~of February 1970, as amended May, 1984,~~ or any subsequent    286

modification or replacement thereof                                                                          287

### ~~28. Cargo Gear and Lights~~                                                                            288

~~The Owners shall maintain the cargo handling gear of the Vessel which is as follows~~                       289

..........................................................................................................   290

..........................................................................................................   291

..........................................................................................................   292

~~providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also~~    293

~~provide on the Vessel for night work lights as on board, but all additional lights over those on board shall~~    294

~~be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If~~      295

~~required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the~~    296

~~Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or~~     297

~~insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that~~   298

~~time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned~~       299

~~thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If~~     300

~~required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which~~    301

~~case the Vessel shall remain on hire.~~                                                                     302

### ~~29. Crew Overtime~~                                                                                    303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~    304

~~the Charterers shall pay the Owners, concurrently with the hire. ............................... per month~~    305

~~or pro rata.~~                                                                                              306

### ~~30. Bills of Lading~~  (See clause 60)                                                                  307

~~(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates~~    308

~~or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the~~    309

~~Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts~~    310



10

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall   311

indemnify the Owners against all consequences or liabilities which may arise from any inconsistency   312

between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master   313

at their request.   314

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and   315

Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for   316

Any loss, damage, expense or delay howsoever caused."   317

### 31. Protective Clauses   318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of —————   319

lading or waybills issued hereunder.   All Bills of Lading or Waybills signed hereunder shall contain or to be deemed to   320

contain the following clauses:

(a) CLAUSE PARAMOUNT   321

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the   322

United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national   323

legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall   324

be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the   325

carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said   326

applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such   327

Term shall be void to that extent, but no further."   328

And   329

(b) BOTH-TO-BLAME COLLISION CLAUSE   330

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any   331

act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in   332

the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against   333

all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents   334

loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other   335

or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the   336

other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.   337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or   338

objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or   339

contact."   340

And   341

(c) NEW JASON CLAUSE   342

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage   343

resulting from any cause whatsoever, whether due to negligence or not, for which, or for the   344

consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,   345



11

shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the    346

payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    347

and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349

or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    350

the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351

be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    352

And    353

(d) U.S. TRADE – DRUG CLAUSE    354

"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the    355

Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356

narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences    358

of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel    359

harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360

against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,    361

as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account    362

and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    364

clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    365

time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    367

event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    368

Vessel's personnel.¹    369

And    370

(e) WAR CLAUSES    371

(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the    372

Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state    373

of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration    374

of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,    375

seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de    376

facto authority or any purported governmental organization maintaining naval, military or air forces).    377

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring    378

the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not    379

exceeding a valuation of ................................ ...............................In addition, the Owners may purchase and the    380

Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,    381



~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ 382

~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ 383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~ 384

~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~ 385

~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~ 386

~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ 387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ 388

~~Charterers' account." See Clause 70~~ 389

**32. War Cancellation** 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or 391

more of the following countries ................ **United States of America, Russia, United Kingdom, France,** 392

**Japan, Germany, Thailand and China** .. .................................. ............................... ............................ ..................................... 393

......................... ....................... ............................... ............................... ..................... ....................... 394

......................... ....................... ............................... ............................... 395

either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall 396

redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after 397

discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near 398

open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she 399

then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall 400

continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this 401

Charter Party shall apply until redelivery. 402

**33. ~~Ice~~ "BIMCO ~~Ice~~ Clause"** 403

~~The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area~~ 404

~~where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is~~ 405

~~risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and~~ 406

~~remain in the port or area or to get out after having completed loading or discharging. Subject to the~~ 407

~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her~~ 408

~~size, construction and ice class.~~

**The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, lightship, marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that ordinary the vessel will not able on account of ice to reach the place or to get out after having completed loading or discharging. The vessel not to be obliged to force ice, nor to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and/or damaged, he has the liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any of the above causes to be for the Charterers' account.** 409

**34. Requisition** 410



Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter    411

Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid    412

by the said government in respect of such requisition period shall be retained by the Owners. The period    413

during which the Vessel is on requisition to the said government shall count as part of the period provided    414

for in this Charter Party.    415

If the period of requisition exceeds 02 months, either party shall have the option    416

of cancelling this Charter Party and no consequential claim may be made by either party.    417

### 35. Stevedore Damage    418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all    419

damage to the Vessel caused by stevedores provided the Master has notified the stevedores and the Charterers and/or their    420

agents in writing as soon as practical but not later than 24 hours after any damage is discovered and always prior to the vessel

sailing from the port except for hidden damage which to be notified to stevedores/ Charterers as soon as discovered but latest    421

upon completion of discharging.

Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent    422

of such damage. Master to do utmost to obtain stevedores signature accepting liability for all damage caused by stevedores    423

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew    424

and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs    425

of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed    426

and if required passed by the Vessel's classification society.    427

(b) Any and all damage (s) not described under point (a) above shall be repaired at the Charterers' option,    428

before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will    429

be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for    430

which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the    431

Owners' work.    432

### 36. Cleaning of Holds    433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~    434

~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~    435

~~local regulations, at the rate of per hold.~~    436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~    437

~~accepted or passed by the port or any other authority. The Charterers shall have the option either to re-deliver~~    438

~~the Vessel with unclean/unswept holds against a lumpsum payment of USD 1,250 in lieu of cleaning. Or alternatively,~~

~~Charterers to pay this amount directly to Master of the vessel.~~    439

**Please see Clause 52**

~~37. Taxes~~  See clause 57    440

~~Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners~~    441

~~resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter~~    442



14

~~Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding~~    443

~~taxes levied by the country of the flag of the Vessel or the Owners).~~    444

~~**38. Charterers' Colors**~~    445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~    446

~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~    447

~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~    448

~~shall be for Charterers' account.~~    449

**39. Laid Up Returns**    450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their    451

underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum    452

period of 30 days if on full hire for this period or pro rata for the time actually on hire.    453

**40. Documentation**    454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the    455

Vessel to trade within the agreed trade limits, including, ~~but not limited to certificates of financial~~    456

~~responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'~~    457

~~P & I club,~~ valid international tonnage certificate, ~~Suez and Panama tonnage certificates,~~ valid certificate    458

of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. **Charterers agree that Owners'**    459
**obligation in this respect are limited to rules and regulations in force at the date of this C/P.**

**41. Stowaways**    460

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining    461

access to the Vessel by means of secreting away in the goods and/or containers shipped by the    462

Charterers.    463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained    464

access to the Vessel by means of secreting away in the goods and/or containers shipped by the    465

Charterers, this shall amount to breach of charter for the consequences of which the Charterers    466

shall be liable and shall hold the Owners harmless and shall keep them indemnified against all    467

claims whatsoever which may arise and be made against them. Furthermore, all time lost and all    468

expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account    469

and the Vessel shall remain on hire.    470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to    471

Sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a    472

reasonable time, the Vessel is released and at their expense put up bail to secure release of the    473

Vessel.    474

(b) (i) If despite the exercise of due care and diligence by the Owners, stowaways have gained    475



15

access to the Vessel by means other than secreting away in the goods and/or containers shipped   476

by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including   477

fines, shall be for the Owners' account and the Vessel shall be off hire.   478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel   479

by means other than secreting away in the goods and/or containers shipped by the Charterers,   480

the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel   481

is released and at their expense put up bail to secure release of the Vessel.   482

**42. Smuggling**   483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any   484

fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.   485

**43. Commissions**   486

A commission of  **1.25 per cent** is payable by the Vessel and the Owners to   487

**Endeavour Shipbrokers Pte Ltd + 1.25 per cent to Grand Pacific Ltd**

   488

.............................. .............................. .............................. .............................. ..............................   489

.............................. .............................. .............................. .............................. ..............................   490

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter   491

**44. Address Commission**   492

**An address commission of 3.75 percent is payable to Charterers**   493

.............................. .............................. .............................. .............................. ..............................   494

.............................. .............................. .............................. .............................. ..............................   495

.............................. .............................. ..............................on hire earned and paid under this Charter.   496

~~45. Arbitration~~   497

~~(a) NEW YORK~~   498

~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~   499

~~subject to U.S. Law:~~   500

~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their~~   501

~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~   502

~~agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~   503

~~shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of~~   504

~~Maritime Arbitrators Inc.~~   505

~~For disputes where the total amount claimed by either party does not exceed US $ **~~   506

~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~   507

~~of Maritime Arbitrators Inc.~~   508

~~(b) LONDON~~   509



~~All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree...........~~    510

~~forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business~~    511

~~in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,~~    512

~~one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No~~    513

~~award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as~~    514

~~above, unless objection to his action be taken before the award is made. Any dispute arising hereunder~~    515

~~shall be governed by English Law.~~    516

~~For disputes where the total amount claimed by either party does not exceed US $ **~~    517

~~the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime~~    518

~~Arbitrators Association.~~

519

**Arbitration if any in Hong Kong with English law**

\* *Delete para (a) or (b) as appropriate*    520

\*\* *Where no figure is supplied in the blank space this provision only shall be void but the other provisions*    521

*of this clause shall have full force and remain in effect.*    522

If mutually agreed, clauses **46 to 100** both inclusive, as attached hereto are fully    523

incorporated in this Charter Party.    524


**For Owners**                                **For Charterers**




**Namjeon International Co., Ltd**            **Transasia Pool Pte Ltd**






**RIDER CLAUSES**

TO

M/V "EASTERN SUN" / TRANSASIA

CHARTER PARTY DATED 25 FEBRUARY 2008

46. On/ Off-hire survey:

Joint on/off hire survey to be carried out on delivery and redelivery to ascertain the vessel's condition and bunker quantities remaining on board on delivery/redelivery by one surveyor acceptable to both parties.

Time for on-hire survey to be for Owner's account only if loading operation prevented from such survey and time for off-hire to be for Charterers' account but costs to be equally shared between both parties

47. Cargo exclusion:

Arms, ammunitions, explosives and/or combustible and/or inflammable and/or injurious cargoes, black powder, blasting caps, detonator caps, loaded bombs, tnt, dynamite, war materials, acids, asphalt and/or its products, ammonium nitrate, ammonia chlorine, asbestos, bitumen, bones, borax, boycott cargoes, calcium carbite, calcium hypochlorite, carbite, caustic soda, cocoa, coffee, cotton, corrosives, creosoted goods, ferrosilicon manganese, fishmeal, , gaseous coal, gasoline, gypsum hides, hypochlorite solutions, harmfull and corrosive ferts, hooves, limestone, livestock, locomotives, motor spirit, manioc and/or manioc pellets, naphtha, nefiline syenite, nigerseeds, nitrate of soda, oilcakes, oily pieces, oily expellers, organic peroxides, potassium chloride, petroleum, petroleum derivatives and all its products, pesticides, pollard pellets, potash, quebracho, radioactive and/ or nuclear products and/or their wastes, nuclear fuel, radioisotopes, motor block, turnings, shavings, spirit, sunflowerseeds, sulphate, sponge iron, toxics, tar or any of their products, turpentine, zinc ashes, as well as any other exception as per the institute radioactive contamination exclusion clause (CL 27, ITC hulls 1/11/95). Also any other cargo offering immediately or long terms the safety of the vessel.

Only harmless cargoes according to IMO regulations, any precaution to the vessel and port authorities/regulations required for carried cargo to be for Charterers account.

48. Pollution of seawaters:

The vessel shall comply with the Regulation of Water Pollution including the Japanese Law on Liability for Oil Pollution Damage effective on 1st March, 2005.

If any pollution occurs, then time lost and all expenses incurred due to contravention of the Regulations to be for Owners' account.

49. Owners P. and I club:

Charterers to have the benefit of Owners' Protection and Indemnity Association as far as its Rules permit. The vessel on her delivery and during this Charter is covered by the association approved by Japanese Government.



Head owners P and I Club:    London Steamship

Disponent owners P and I Club  To be advised

Charterers P and I Club    Swedish Club

50. Deratting:

Vessel to be delivered with valid fumigation and/or deratisation or Deratting Exemption Certificate on board, and if this does not cover the whole period of this Charter and renewal of certificate or fumigation is necessary, cost of the same and delay of the vessel and expenses incurred therefrom to be for Owners account.

51. Deck cargo:

Charterer has option to load intention cargo on deck/hatch cover at Charterers time/risk/expenses in accordance with vessels' deck/hatch cover strengthen and vessels' stability at Masters' discrestion.

52. Hold cleaning, cable charges, Victualling Fee:

USD3,500 lumpsum including disposal/removal of dunnage/lashing/material/debris. Intermeidate hold cleaning: USD 2,500 lumpsum per voyage including disposal/removal of dunnage/lashing/material/debris and hatch cover operation Charterers to pay additional USD 1,000 per voyage for crew's extra work including stanchion set up/dismentlement/cat walk/lashing/unlashing/relashing for log shipment. Cables/Entertainment/Victualling: USD 1,300 per month.

53. Officer/ Crew work:

1) Before and upon vessel's arrival at a port, vessel's officers/ crew to shape up vessel's hatches, derricks or cranes and gangway, and rig cargo gear in order to commence loading and/ or discharging at once.

2) At each loading/ discharging port, the first opening/ last closing of all hatchcovers (including removing and replacing of beams) shall be done by officers/ crew free of charges to Charterers, if permitted by shore labour regulations.

But intermediate hatches operation to be for Charterers' account.

However, if requested by Charterers and permitted by shore labour regulations, officers/ crew to handle the intermediate hatches operation, for which Charterers to pay allowance to them under direct negotiation between Master and Charterers.

19

3) The crew to examine daily the security of cargo carried and shall relash the same or tighten ot repair or otherwise modify the lashing or other securing arrangement as may be found to be necessary on such examination, but subject to weather permitting.

4) Master to undertake the best efforts to cooperate with Charterers for the best stowage of cargo, and if requested paid by Charterers, to collect and redeliver any useful dunnage, lashing materials, etc. supplied by Charterers.

54. Boat/ Taxi hire:

Boat hire (or Bus hire) for Charterers' business to be for Charterers' account and for Owners' business to be for Owners' account. But in case it is unclear whether the boats/ taxies or buses are used for Charterers' business or Owners' business, the hire to be equally shared between Owners and Charterers.

55. Watchmen and garbage costs:

Gangway watchmen if ordered by Master for ship to be for Owners' account but watchmen for cargo and compulsory watchmen to be for Charterers' account. Garbage disposal to be for Charterers account

56. Agency fee for Owners matter:

Charterers agree that their Agents undertake ship's husbandry as Owner's agent against Owners payment of actual expenses incurred plus normal agency fee in accordance with the agents tariff. However, for extraordinary business (such as major repairs, dry docking and general average of the vessel), Owners always to appoint their own Agents.

In case of appointing Charterers' agent, Charterers to assist in advancing the incurred costs to their agent and deduct the costs from the next Charter hire.

57. Taxes:

All taxes on cargo or voyage freight to be for Charterers account, except income taxes and taxes on Time Charter hire levied in the country of the vessel and/or Owners' domicile which to be for all Owners' account.

Any due, duties and/ or taxes on crew and/or store to be for Owners account.

58. Bunkers:

Bunker on delivery to be about 800MT IFO and about 70MT MDO.



20

Bunkers on redelivery to be about same quantity as on delivery.

Bunker prices both ends - IFO price USD 490PMT, MDO/MGO price USD 850PMT

Charterers on delivery and Owners on redelivery to take over and pay for estimated bunkers ROB. Payment for bunkers on delivery to be paid together with the first charter hire. Value of bunkers on redelivery to be deducted from last hire payment.

Charterers/Owners allowed to replenish additional bunker if necessary at yard/last discharge port before delivery/redelivery at Charterers/Owners account provided the same not interfere with proper operation of the vessel.

59. Deduction from hire payment:

No reservation for Owners' expenses. See also Clause 66.

60. Bills of Lading signature:

Charterers' form of Bill(s) of Lading to be used under this Charter Party. Charterers and/or their agents to be authorized by Owners to sign Bill(s) of Lading on Master's behalf as presented strictly in accordance with Mate's receipt without prejudice to this Charter Party. However, Charterers to accept all consequences that might result from Charterers and/or their agents signing Bill(s) of Lading not adhering to the remarks in Mate's Receipts.

Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

Owners to allow Chaterers to discharge cargo without presentation of original Bill(s) Lading against Charterers provide L.O.I as per Owners P and I wording signed by Charterers only.

Charterers and/or their agents have option to sign Bill(s) of Lading on behalf of Master in accordance with mate's or tally's receipt without prejudice to this CP.

61. Owner guarantee that the vessel is not black listed by trading countries due to vessels' flag, owner ship and whatsoever.

62. Deviation/ Put back:



21

In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back while on the voyage, caused by sickness of or an accident to or misconduct by Master/ Officers/ Crew, stowaway, or by reason of refusal of Master or Officer(s) or crew to perform their duties or of an accident or breakdown to vessel (or drydocking or periodical survey), the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until vessel becomes again efficient in the same position or regain the line of voyage whichever shorter distance for the port where vessel is originally destined for and the voyage resumed therefrom, and all expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

63. Detention for quarantine:

Normal quarantine time and expenses to enter a port to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness, etc. of Master, and crew to be for Owners account. Owners shall be liable for any delay in quarantine arising from the Master or any deck or engine officers or crew having communication with the shore at any infected area without the written consent or instruction of the Charterers or their agent.

64. Smuggling:

Any delay, expenses and/or fine incurred on account of smuggling or other infraction of local law if caused by Charterers, Supercargo and/or their staff or Agents to be for Charterers account, and if caused by crew and/or officers to be for Owners account.

65. Seizure/ Detention/ Arrest:

Should vessel be seized or detained or arrested or delayed by any authority during the currency of this charter, the charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay, and all time lost by those reasons shall be treated as off-hire untill the time of her release, unless such seizure or detention or arrest or delay is occasioned by personal act or omission or default of Charterers or their agent.

Any extra expense incurred by and/or during the above seizure or detention or arrest or delay to be for Owners account. Charterers in addition have the option to terminate this charter if the vessel be arrested or remain unemployed for more than **15 (fifteen)** days continuously.

66. Owners Account

No deposit to be resereved by Charterers. If any Owners matters are occurred, Master to pay for it by cash. Otherwise refer to the clause 56.



22

67. Cargo gear:

Vessel's cargo gear and all other equipments to comply with the regulations and/or requirements in effect at the ports of call, and vessel is all times in possession of valid upto date certificate on board necessary to comply with such regulations and/or requirements.

Should vessel not meet the regulations and/or requirements, Owners to make immediate corrective measures and that time thereby lost, any stevedores' stand-by time and expenses invloved to be for Owners' account.

68. Breakdown of Winches:

In the event of a failure or breakdown of a derrick or derricks, or a crane or cranes, a winch or winches or any place of equipment connected thereto by reason of disablement or insufficient power, the hire to be reduced pro-rata for the period of such inefficiency in relation to the number of winches and/or derricks or cranes available. Owners are to pay in additon the cost of labour on board affected by the failure or breakdown, either idle or additionally engaged.

Owners are to pay for the cost of hiring shore appliances in lieu of them, if required by charterers, vessel to be prorata on hire until commencement of using such shore appliances.

However, if the above expenses/ loss/ time incurred by mishandling of stevedores which to be for Charterers' account.

69. Cargo claim:

Liabilities for cargo claims shall be borned by Owners/ Time-Charterers in accordance with the Interclub New York Produce Exchange Agreement in February, 1970 and as amended September, 1996, or any subsequent modification or replacement thereof.

The party having paid the claim shall submitted to the other party supporting documents as soon as possible. Neither party shall between themselves refer to the 1 (one) year time limit as a defence.

70. Incorporating Clause:



23

New Jason clause, New Both-to-Blame Collission clause, Chamber of Shipping War Risks clause 1 and 2, Hague Visby Rules Legislation shall be deemed to be incorporated in this Charter party and Bills of Lading issued hereunder.

71. Prior Superficial Inspection / and hold on delivery:

Charterers to have the option of holding a superficial inspection prior to delivery and also at any time of this Charter, Owners and master to give every facility and assistance to carry this out.

On Delivery all cargo holds to be completely clean/swept/washed down by fresh water and dried up and fully ready to receive any permissible cargo allowed under this charter in all respects free of salt,rust scale and previous cargo residue and should pass shipper or competent authorities inspection.

Otherwise vessel to be put off-hire from the time of failing until the time of passing re-inspection and any time lost/expenses incurred thereby to be for Owners account.

72. Charterers' flag:

Charterers to have NO the previlege of flying their own house flag.

73. Boycott:

Should the vessel be boycotted, picketted, blacklisted, or involved in similar incidents at any port or place by the shore and/or port labour and/or tug boats and/or the pilots, or by the government and/or any authority by reason of vessel's flag or the terms and conditions on which members of the officers/ crew were employed, or other events immobilizing the vessel then to be off-hire for any time lost thereby and the cost of bunkers comsumed during the period to be for Owners' account.

74. Major's war:

If war breaks out (wether there be a declaration of war or not) between any 2 (two) or more of he following countries:

United Kingdom, United States of America, Russia, The People's Republic of China, Thailand, and Japan directly affecting performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall deliver the vessel to Owners, if she has cargo on board



24

after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by charterers. In all cases hire shall be paid in full until the vessel's redelivery.

75. Cargo fumigation:

During cargo fumigation, if crew are not allowed to stay on board, their meals, transportation and accomodation ashore shall be for Charterers account. If crew are allowed to stay on board, Charterers shall give USD 20.00 per person per day as bonus.

76. International Safety Management (ISM) code:

The Owners shall guarantee that both the vessel and 'the Company' (as defined by the International Safety Management (ISM) code) shall comply with the requirements of the I.S.M code. If requested by charterers, Owners shall provide the copy of relevant documents.

77. Insurance:

Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for hull, machinery, and Officers/ crew as well as crew war bonus and any other expenses, if any, due to the vessel's trading to the restricted area shall be for Charterers' account.

78. Ship's Particulars
Last 6 cargoes with calling port end:
Wheat/Nouakchott - citrus pulp pellet/Dublin - fertilier/San Nicolas SBM/Prevea - stl product/Abu Dhabi - Urea/Manila

MV. EASTERN SUN (EX. NEW EXPLORER) - AS PER DESCRIBED HEREBELOW
SINGLE DECK LOG BULKER
BUILT YEAR AND PLACE: 25/AUG' 1993, SAIKI HEAVY INDUSTRIES CO LTD, JAPAN
FLAG : VIETNAM
PORT OF REGISTRY : HAIPHONG, VIETNAM
CLASS : NKK - VR
DEADWEIGHT
22,201 DWT ON 9.115 M SSW (TPC 32.825)
21,587 DWT ON 8.925 M WINTER SEA WATER(TPC 32.665)
LOA/BM/DEPTH: 157.50/25.0/12.7 MTRS
GRT/NRT(MT):



INTERNATIONAL 13.706 / 7,738
PANAMA 14,416.864/11,266.01
SUEZ 13,919.84 / 12,463
4HOLD/4 HATCH
HOLD CAPA - GRAIN/BALE CAPA
TOTAL 29,301.27 / 28,298.54
HATCH COAMING HEIGHT FM MAIN DECK: 1.60M
HATCH SIZE
NO.1 20.00X17.52(B1)X11.68(B2)
NO.2 20.80X17.52
NO.3 20.80X17.52
NO.4 20.80X17.52
CONSTANT EXCL. FRESH WATER 270MT
4 X 30T ELECTRO-HYD CRANES
CRANE OUTREACH : NO.1 ABT 8.0MTRS, NO.2/3/4 : ABT 9.0MTRS
TYPE OF HATCH COVER : MAC HYDRO FOLDING
VESSEL'S HOLD FREE OF ABSTRUCTIONS
VESSEL IS SUITABLE FOR GRAB DISCHARGING
VESSEL IS FITTED CO2 IN HOLDS
VESSEL HAS 1 ELECTRICAL FAN EACH HOLD(CAPA.4000M3/MIN, APPROX.
3TIMES/HR)
AHL FITTED
VESSEL IS FITTED FOR CARRIAGE OF GRAIN
VESSEL IS FITTED STANCHION(5SETS EACH SIDE) WITH 56 SOCKETS
VESSEL HAS LOG MATERIALS
SPEED AND CONSUMPTION:-
ABOUT 13.0KTS ON IFO 180CST ABT 18.0MT PLUS MDO 1.50MT AT SEA
IN PORT/IDLE MDO ABT 1.0MT, IN PORT/WORKING 2.5MT
THE SPEED OF THE VESSEL IS ALWAYS TO BE CONSIDERED AS AVERAGE SPEED
IN FULLY LADEN CONDITION AND GOOD WEATHER, NO ADVERSE CURRENT, NEGATIVE
INFLUENCE OF SWELL, MODERATE SEA, WIND NOT EXCEEDING BEAUFORT FORCE
3(THREE)/BEAUFORT FORCE 4
(FOUR) AND/OR DOUGLAS SEA STATE 3 (THREE) THE PROPER WORK OF CRANES IS GIVEN
IN ATMOSPHERIC
TEMP UPTO +35 DEGREES CELCIUS

THE VESSEL TO HAVE THE LIBERTY OF USING DIESEL OIL WHEN WHEN ENTERING AND
LEAVING PORT AND FOR MANOEUVRING IN SHALLOW WATER"

tank top/deck/hatch cover strength -UPPER DECK 3.67T/M2
-ON HATCH COVER 3.00T/M2
-TANK TOP 13.00T/M2

Owners guarantee that vessel's holds are to be clear of any fitting/super structures such as cardeck/curtain
plates/center fitting whatsoever and suitable for grab discharging


79. Loading/Discharging during rain

Master to follow Charterers instructions with respect to load during rain and Charterers shall indemnify the

Owners from any consequences arising from the loading and/or discharging during rain and issue Letter of

Indemnity under Charterers letter head as per Owners PNI form. Charterers to be allowed to load/discharge

hot rolled coils only during rain subject to such operation not affecting other cargos on board the vsl.



80. Heavy Coils:

Heavy coils to be loaded in 1.5-2.0 tiers not exceeding tanktop-strength in average in accordance with loading manual of steel mills, and lashed/dunnaged under supervision of master, and all dunnage/lashing/securing to be for Charterers' account/risk/expenses at Master's discretion and upto Master's Satisfaction.

81. Cargo release without original Bs/L:

Should original bill(s) of lading not arrive at discharging port in time, then Charterers may request that Owners to release entire cargo without presentation of original B(s)/L. The Charterers undertake and agree that they shall indemnify and hold the Owners harmless against all consequences arising from the Owners conforming to the Charterers request in releasing cargo without production of original Bills of Lading. The Charterers are to issue a single Letter of Indemnify to the Owners in accordance with "Standard P&I Club" wording.

82. Only first opening and last closing of hatches to be for Owners account.

Charterers have to pay the intermediate hatch operation charges, self pilotage to Master directly by their tariff.

Crew bonus to be for Charterers account

83. All dues, duties, charges and/or taxes on the vessel (except those belonging to customary disbursements) and/or Charter hire to be for Owners account. The same on the cargo and freight to be for charterers account.

84. Off-hire:

In the event of any delay to the vessel directly arising from one or more of the following reasons:

- Deficiency of officers/crew or store.
- Breakdown partial or otherwise, damages to hull, machinery, equipment.
- Detention due to damage to the vessel or to the cargo caused by average incidents such as collision and stranding.
- Repairs/drydocking or their necessary measures to maintain the efficiency of the vessel.
- Failure to be in possession of valid certificates or their documentation for the vessel/officers/crew.
- Breakdown partial or otherwise, non-conformity or disablement of one or any/all winches/cranes or any other part of vessel's equipment for loading/discharging cargo preventing full operation of vessel.
- Insufficient power to operate all winches/cranes at the same time if required.
- Residues of cargo(es) carried prior to delivery under this Charter Party and/or loose rust scale and/or loose rust in holds resulting in failure to pass survey by official inspectors.
- Deviation from the course of the voyage or putting back whilst on voyage,



27

Caused by sickness of or an accident to or misconduct by Master/Officers/Crew, stowaway, or by reason of the refusal of Master or Officer(s) or
crew to perform their duties or of an accident or breakdown to Vessel(or
dry-docking or periodical survey).
-       Quarantine due to pestilence, illness, etc. of Master/Officer(s)/Crew to be for Owners' account.
Owners shall be liable for any delay in quarantine arising from the Master or any of deck or engine
Officers or Crew having communication with the shore at any infected area without the written
consent or instruction of the Charterers or their agents.

The vessel to be off-hire for any/all time thereby lost and Owners to pay all expenses incurred directly
related to the vessel, together with the cost of any fuel/gas/diesel oil consumed in consequence thereof,
including but not limited to stevedores stand-by time, if any, and which shall all be deducted from the hire.

In the event of the vessel for any cause or for any purpose aforesaid, putting into any port other than the
port for which she is bound on the instructions of Charterers except as covered in bottom cleaning clause,
the port charges, pilotage and other expenses at such port shall be borne by Owners.

85.  Master's Instructions

The Master is to conform to Charterers or their representatives' or their agents' instructions and to execute

the voyage(s) with the same due care diligence as if he were trading for Owners own account.  Charterers

to furnish Master with voyage report forms and other relevant documents which the Master is to complete

and return to Charterers.  Such reports/documents to be written in English

86.  Speed Claims/Misdescription

Notwithstanding the terms stated into Clause 78 of this Charter Party, if during the currency of this Charter

Party the speed of the vessel  (as described and warranted in the Charter Party) be reduced and/or oil fuel

consumption be increased solely due to Owners' proved negligence, Charterers shall have the right to

deduct from hire an amount equivalent to the time lost and/or cost of any extra fuels consumed.  Evidence

of wind and sea conditions to be taken from the vessel's log and independent weather routing reports for

the area.  In the even of consistent discrepancies between the two, the latter to be taken as ruling for this

purpose.

87.  Classification

Owners guarantee that vessel's classification society is a full member of the International Association of

Classification Societies and will remain so throughout the duration of this Charter Party.

88.  Pre-loading survey for steel products

The cost for pre-loading survey for steel products to be for account of the party who ordered same.

89.  Hatch Cover Conditions

Owners guarantee tht vessels hatch covers are to be watertight all throughout this charter period and if any



28

hatch cover found defective, same to be rectified at Owners time and expense to independent surveyors satisfaction. Charterers also have the right to carry hose test on all hatches at any time during this charter.

90. Double Banking

Charterers have the right to load and/or discharge on double banking basis or any other means available at loading and/or discharging port or place, always subject to Master's reasonable satisfaction, any additional equipment/facilities such as fenders whenever considered necessary by the Master are to be supplied by the Charterers in their time and at their expenses. If at any time during the operation the Master reasonably considers it unsafe to continue due to adverse weather conditions etc., Master may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account.

91. Hire payment :

1st hire plus value of bunker on dely to be paid within three banking days after delivery. Charterers are entitled to deduct Owners expenses as well as estimated value of bunker on redelivery from last sufficient hire payment.

Hire to be telegraphically transferred to:

Bank: Shinhan Bank, Sogong Jung-Ang Branch, Seoul in korea

Beneficiary: NJ Shipping Co., Ltd

Account No (USD): 180-004-173715

SWIFT Code: SHBKKRSE

92. If Charterers call CIS Pacific port(s), then Charterers to arrange any relevant Certificates which confirm vessel is free from gypsy moth.

No calling record at CIS Pacific ports since last 8 months.

Russian Gypsy Moth Clause

Asian Gypsy Moth Clause:

Owners guarantee that upon delivery to Charterers the vessel is free of any infestation by the Asian gypsy moth or its eggs. Should the Owners fail to fulfil their guarantees as above, the Owners shall indemnify the Charterers from any loss or damage sustained by Charterers and all consequences arising from/in



connection with such failure including but not limited to any delay, extra expenses, fines, cost of removal of such moth or its eggs and/or even trans-shipment of cargo if on board, regardless of whether or not the vessel would be banned from entering into or ordered to leave the Canadian and/or U.S. waters/ports because of said failure.

When Charterers direct the vessel to the area infested by Asian gypsy moth, Charterers shall, at Charterers' time and expense, undertake to arrange a certificate issued by an appropriate authority of such area/port certifying that the vessel is free from infestation by Asian gypsy moth or its eggs and thereby Owners shall not be held responsible for any consequences at the next destined

93. Owner guarantee that the vessel's hold are to be clear of any fitting/superstructure such as cardeck, curtain plates, container fitting whatsoever and suitable for grab discharging.

94. Deleted.

95. Owners guarantee that valid equivalent I.T.F agreement for the vessel covering any port or place is available on board for the whole period of this Charter party

96. Owners guarantee that the vessel will comply with IMO regulations and requirements.

97. All negotiations and eventual fixture to be kept strictly private & confidential

98. BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain

the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

99. BIMCO STANDARD ISM CLAUSE
From the date of coming into force of the International Safety Management(ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that vessel and "the company"(as defined by the ISM Code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of relevant document of compliance(DOC) and Safety Management Certificate(SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of "the company" to comply with the ISM Code shall be for the Owners' account.

100. Y 2 K Clause
"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the Year 2000.

Without prejudice to their other rights, obligations and defences under this contract including, where applicable, those of the Hague or Hague-Visby Rules, Owners and Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this Contract.

**For Owners**                          **For Charterers**

**Namjeon International Co.,Ltd. Seoul**        **Transasia Pool Pte Ltd,**



# EXHIBIT 2

**TRANSASIA POOL PTE LTD, SINGAPORE**   (GST REG. NO. M2-0101676-2)
**(REG. NO. 199104297M)**

### EASTERN SUN/TASPL 999001

**TIME CHARTERED IN (TCIPRV/H)**
**PROVISIONAL HIRE STATEMENT**

| | |
|---|---|
| **NAMJEON INTERNATIONAL CO LTD** | Page: 1 |
| c/o **ENDEAVOUR SHIPBROKERS PTE LTD** | Date: 25/06/2008 |
| **LEVEL 34 CENTENNIAL TOWER** | FixNote: 4460 |
| **3 TEMASEK AVENUE** | Time: GMT |
| **SINGAPORE 039190** | C/P Date: 25/02/2008 |
| | Currency: USD |

| Description | Debit | Credit |
|---|---|---|
| Delivery DLOSP SINGAPORE 26/02/2008 - 16:01 GMT | | |
| Redelivery DLOSP DAKAR 16/06/2008 - 14:50 GMT | | |
| Period 26/02/2008 - 16:01 - 16/06/2008 - 14:50 110.95069 days (110D- 22H- 49M) | | |
| Hire = 110.95069 Days 26250.00 Per Day | | 2,912,455.61 |
| OFFHIRE AT TARJUN DUE FAILED HOLD INSPECTION 01/03/2008 13.30 LT - | | |
| 16/03/2008 - 16.30 LT = 15.125 Days | | |
| 15.125 Days 26250.00 Per Day | 397,031.25 | |
| Bunkers consumption : MDO / 16.643 tons x 850.00 | 14,146.55 | |
| OFFHIRE AT YANGON DUE OWNERS REFUSED TO BERTH THE VESSEL | | |
| 02/04/2008 - 23.20 LT - 04/04/2008 11.40 LT = 1.51389 Days | | |
| 1.51389 Days 26250.00 Per Day | 39,739.61 | |
| Bunkers consumption : MDO/ 1.514 tons x 850.00 | 1,286.90 | |
| 3.750 % Address Commission | 92,838.18 | |
| 1.250 % Commission ENDEAVOUR SHIPBROKERS PTE LTD | 30,946.06 | |
| Bunkers on delivery (survey figure) - IFO: 785.698 tons x 490.00 | | 384,992.02 |
| Bunkers on delivery (survey figure) - MDO: 74.403 tons x 850.00 | | 63,242.55 |
| Bunkers on redelivery - IFO: 585.709 tons x 490.00 | 286,997.41 | |
| Bunkers on redelivery - MDO: 40.811 tons x 850.00 | 34,689.35 | |
| Cable/Vict/Ent = 110.95069 Days 1300.00 Per Month | | 4,726.17 |
| FAILED HOLD INSPECTION AT TARJUN = 15.125 Days 1300.00 Per Month | 634.27 | |
| OWNERS REFUSED TO BERTH THE VSL AT YANGON = 1.51389 Days 1300.00 | 65.60 | |
| Per Month | | |
| Cleaning on Redelivery | | 3,500.00 |
| Intermediate hold Cleaning | | 2,500.00 |
| Amount paid on 28/02/08 | 816,947.02 | |
| Amount paid on 17/03/08 | 297,901.69 | |
| Amount paid on 27/03/08 | 366,024.57 | |
| Amount paid on 03/04/08 | 91,460.43 | |
| Amount paid on 11/04/08 | 374,712.49 | |
| Amount paid on 27/04/08 | 377,197.57 | |
| Amount paid on 13/05/08 | 374,691.52 | |
| Amount paid on 27/05/08 | 374,908.04 | |
| Amount paid on 10/06/08 | 248,712.49 | |
| Amount paid on 11/06/08 | 126,058.00 | |
| Total bank charge (USD29 x 9) | | 261.00 |
| Est joint on-hire survey fee (USD1,050 x 50% = USD525 + 2.5% comm USD13.13) | 538.13 | |
| Owners expenses reserve | 10,000.00 | |
| | 4,357,527.13 | 3,371,677.35 |

**Balance in charterers favour**             **985,849.78**

**EASTERN SUN/TASP  999001**

Date:    25/06/2008

Page:    2

**Description**
Brought Forward

**Debit**          **Credit**

**Remit to:**
To : Citibank New York, SWIFT Code : CITIUS33
For Credit Of: Citibank N.A., Hong Kong Branch, 10/F, Harbourfront II, 2 Tak Fung Street,
Hunghom, H.K., SWIFT Code : CITIHKHX
In Favour Of: IMC Shipping Co. Pte Ltd
A/C No. 61421413
Remarks: Vessel/ Voyage details

E.& O.E.